**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59153-7-II |
| Respondent, | |
| v. | |
| AMANDA LEE BASSELL, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J.—Amanda Bassell appeals her sentence for domestic violence assault in the first degree. Bassell argues that the prosecutor's conduct at resentencing undermined the State's agreement to recommend a sentence below the standard range.

Because the prosecutor's conduct did not undermine its agreement to recommend a sentence below the standard range, we affirm Bassell's sentence.

FACTS

In 2012, Amanda Bassell stabbed her mother in the throat with a knife. The State charged Bassell with attempted murder in the first degree. In an agreement with the State, Bassell waived her right to a jury trial and agreed to have her case tried to the court in a bench trial. In exchange, the State agreed to reduce her charge from attempted murder in the first degree to first degree assault, and also to recommend an exceptional downward sentence of 120 months in the event she was convicted. Following a bench trial, Bassell was convicted of assault in the first degree. The

trial court did not follow the agreed recommendation and declined to impose an exceptional sentence below the standard range. The trial court instead imposed 236 months, which was the top of the standard sentencing range.

In 2024, Bassell was resentenced pursuant to *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021). Bassell and the State both requested that the court follow the original agreed sentencing recommendation.

Defense counsel began his presentation by addressing the victim: "I want to express my sympathy to you. . . . I know this is difficult. I can't imagine what it was like to go through what you went through at the time." Verbatim Rep. of Proc. (VRP) (Jan. 11, 2024) at 11-12. Defense counsel noted that the victim did not support the sentencing recommendation. Counsel then claimed that if the court accepted Bassell's release plan for post-prison detention at Western State Hospital under the involuntary treatment act then Bassell would not be free and would not "come after" the victim. *Id.* at 12. Counsel said "I hope you do take some solace in the fact that if the court does follow our recommendation, that Ms. Bassell is not going to be released out in the community and free to roam wherever she wants to go, come after you." *Id.* Defense counsel went on to emphasize Bassell's mental health concerns and the progress she had made while incarcerated, and argued to the court that the agreed recommendation would both keep the victim safe and give Bassell treatment at Western State Hospital. Notably, counsel did not provide any documentation to the sentencing court to support his suggestion that there already existed an order purporting to detain Bassell at Western State Hospital upon completion of her sentence.

The State also began its argument by addressing the victim. The State apologized to the victim and recognized that resentencing is a "traumatic experience." *Id.* at 18. The State went on

to acknowledge the unique procedural background of the case, describing the agreement, which was not a plea agreement, as "a little bit of an odd agreement." *Id.* The State then directed the court to the transcript of the original sentencing hearing because it

> actually has the original deputy prosecutor's thoughts of why they entered that agreement, the process that went into that, the mental health concerns that were a part of that agreement and were entered.
> I think that's important for the court to consider, and I think it's honestly a better recitation of the reasons the State entered the agreement and the reasons we continue to abide by that agreement than I could do at this point in time.

*Id.* at 18-19.

The State then addressed defense counsel's comment that Bassell would not be released and clarified that "I am somewhat skeptical, . . . because Western State Hospital has its own rules. . . . I don't want there to be this expectation that Ms. Bassell will go to Western State Hospital and guaranteed be [held] . . . [T]hat ultimately will be beyond . . . the court's control." *Id.* at 19-20. The State followed this clarification by stating "So we are still continuing to recommend an exceptional sentence downward for all of the reasons that went into the original agreement, which from all of the documentation that [defense counsel] has provided remain valid." *Id.* at 20.

After hearing from the victim and Bassell, the trial court declined to follow the agreed recommendation and imposed a sentence at the high end of the standard range.

## DISCUSSION

Bassell argues that the prosecutor's conduct at sentencing undermined the State's promise to recommend an exceptional downward sentence. As an initial matter, we note that if Bassell believed that the State's remarks at sentencing undermined the sentencing agreement, she should have objected at that time. This claim is raised for the first time on appeal, and Bassell should have explained in her opening brief why review of this unpreserved claim is warranted. However,

because the State does not argue that we should decline to review this issue, we exercise our discretion under RAP 2.5(a)(3) to review the claim. We hold that the prosecutor did not undermine the agreement and affirm Bassell's sentence.

A. Legal Principles

It is well established that due process requires a prosecutor to adhere to the terms of a plea agreement, because plea agreements are contracts that concern the fundamental rights of the accused. *State v. Sledge*, 133 Wn.2d 828, 839, 947 P.2d 1199 (1997). This case concerns the prosecutor's obligation to adhere to a promise to make a particular sentencing recommendation in the event of a conviction, in exchange for Bassell's agreement to waive her right to a jury trial and have her case decided by the court. This agreement was intended by the parties to be an enforceable contract. Thus, the agreement in this case is analogous to a plea agreement.

When a defendant gives up important constitutional rights in an agreement with the State, the State has a "good faith obligation" to effectuate the agreement. *Id.* at 840. This obligation applies both at an original sentencing hearing and at resentencing. *State v. Gleim*, 200 Wn. App. 40, 44-45, 401 P.3d 316 (2017). The State may not undercut the agreement either explicitly or "by conduct evidencing an intent to circumvent the terms of the plea agreement." *Sledge*, 133 Wn.2d at 840. At the same time, the prosecutor is not required to act enthusiastically but it must "act in good faith, participate in the sentencing proceedings, answer the court's questions candidly in accordance with [the duty of candor toward the tribunal] and, consistent with RCW 9.94A.460, not hold back relevant information regarding the plea agreement." *State v. Talley*, 134 Wn.2d 176, 183, 949 P.2d 358 (1998).

"We must 'review [the] prosecutor's actions and comments objectively from the sentencing record as a whole' " to determine whether the State complied with its duty of good faith. *State v. Ramos*, 187 Wn.2d 420, 433, 387 P.3d 650 (quoting *State v. Carreno-Maldonado*, 135 Wn. App. 77, 83, 143 P.3d 343 (2006)), *cert. denied*, 539 U.S. 995 (2017). We review de novo whether the State breached its agreement. *State v. Molnar*, 198 Wn.2d 500, 512-13, 497 P.3d 858 (2021).

B. Application

Bassell argues that the prosecutor's conduct undermined the sentence the State recommended. We disagree.

Bassell contends the prosecutor insinuated that he did not personally agree with the recommendation by describing the agreement as " 'a little bit of an odd agreement when you're looking at one of the ramifications of the agreement,' " and by relying on the State's remarks at the original sentencing hearing rather than making fresh arguments about the basis for the recommendation. Br. of Appellant at 12 (quoting VRP (Jan. 11, 2024) at 18). But taken in context, these statements clarified that, while the agreement was not a typical agreement, it was carefully crafted with Bassell's mental health concerns in mind. The prosecutor relied on the original hearing transcript, not because he did not personally agree with the recommendation, but because the original sentencing transcript "actually has the original deputy prosecutor's thoughts of why they entered that agreement, the process that went into that, the mental health concerns that were a part of that agreement and were entered." VRP (Jan. 11, 2024) at 18-19. These statements highlighted the State's assertion that the court should follow its recommendation "for all of the reasons that went into the original agreement, which . . . remain valid." *Id.* at 20.

Next, Bassell argues that the prosecutor undermined the agreement when he apologized to the victim and recognized that resentencing can be a " 'traumatic experience.' " Br. of Appellant at 12 (quoting VRP (Jan. 11, 2024) at 18). But the prosecutor apologized to the victim for having to go through the traumatic experience of resentencing as the result of *State v. Blake*, not for its sentencing recommendation.

Moreover, defense counsel not only made similar remarks to the victim but went even further by saying "I want to express my sympathy to you" and "*I can't imagine what it was like to go through what you went through.*" VRP (Jan. 11, 2024) at 11-12 (emphasis added). As this claim of error is rooted in the idea that expressions of sympathy toward the victim might make the sentencing court, even subconsciously, less inclined toward leniency, this claim borders on invited error. In the least, Bassell cannot show a greater *impact* on the sentencing court from the prosecutor's remarks than from the remarks of her own attorney. The prosecutor did not undercut the sentencing agreement.

Finally, Bassell argues that the prosecutor undermined the agreement when he said he was " 'somewhat skeptical' " that the agreed recommendation would guarantee that Bassell would be held at Western State Hospital. Br. of Appellant at 13 (quoting VRP (Jan. 11, 2024) at 19). Bassell contends that this statement emphasized a reason for the court to reject the agreed sentencing recommendation.

But in context, the State was responding to what was, frankly, a misrepresentation by defense counsel to the victim about the sentencing court's ability to order Bassell's continued detention at Western State Hospital, as part of *the current judgment and sentence*, after Bassell finished serving her sentence. Bassell's hypothetical future detention at Western State at the

completion of her sentence is just that—hypothetical. It was incorrect for defense counsel to imply that detention at Western State after the completion of Bassell's sentence was guaranteed. The State's expression of skepticism was made in response to defense counsel's remark to the victim that "Ms. Bassell is not going to be released out in the community and free to roam wherever she wants to go." VRP (Jan. 11, 2024) at 12. The prosecution clarified that "I don't want there to be this expectation that Ms. Bassell will go to Western State Hospital and guaranteed be [held] . . . [T]hat ultimately will be beyond . . . the court's control." *Id.* at 20. It was entirely appropriate for the prosecutor to correct the misimpression the victim may have been left with as a result of defense counsel's remarks.

The prosecutor went on to emphasize that the State's reasons for its original recommendation of 120 months remained the same. The prosecutor's statements did not undermine the agreement, but rather were consistent with its duty of candor toward the tribunal and obligation to provide relevant information regarding the agreement.

## CONCLUSION

We conclude that the prosecutor's conduct did not undermine the sentencing agreement. Accordingly, we affirm Bassell's sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

MAXA, J.

CHE, J.